IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **ALLIED WASTE SERVICES OF NORTH AMERICA, LLC,** | |
| Plaintiff, | Case No. 16 C 1660 |
| v. | Judge Harry D. Leinenweber |
| **BRIAN TIBBLE,** | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Brian Tibble's Motion to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6)[ECF No. 16]. For the reasons stated herein, the Motion is denied.

### I. BACKGROUND

Plaintiff, Allied Waste Services of North America ("Allied"), is a non-hazardous recycling and waste management company. Compl. ¶ 7. On February 15, 2010, Allied hired Defendant, Brian Tibble ("Tibble"), as a Major Account Executive for the Chicago metro area. Compl. ¶ 19. Prior to his hire, Tibble had no experience in this industry. *Id.* As a Major Account Executive, Tibble was responsible for business retention and business growth for his assigned customer portfolio. Compl. ¶ 20.

After three years in this position, Tibble was promoted to Regional National Account Executive and became responsible for growing and retaining the business of Allied's customers in his region, which included the Midwest from Minnesota to Missouri. Compl. ¶¶ 21, 22. Tibble was the face of the company for these customers and was involved in all aspects of the business, including setting up accounts and building financial models for pricing. In this role, Tibble had access to confidential information, and as such, as a condition of the promotion, Tibble signed a Confidentiality, Non-Solicitation and Non-Competition Agreement. Compl. ¶¶ 22, 21.

On July 28, 2014, Allied again promoted Tibble, this time to the position of Sales Manager. Compl. ¶ 23. In this position, he was responsible for boarding new business and maintaining existing business in his territory, which encompassed the western suburbs of Chicago. Compl. ¶ 24. He also managed all aspects of Allied's revenue for his team, including managing all of their contracts. *Id.* This meant that Tibble approved every contract and, in doing so, received information about all of the customers serviced by the sales representatives on his team, such as the names of decision-makers, contract history, pricing information, particular service issues, scheduled rate increases, contract expiration dates, and open pricing terms. Compl. ¶ 25. He was also

involved in Allied's 2016 budget process, which gave him access to Allied's highly confidential financial information including every customer's contract expiration date by month for the next three years with their exact pricing plan. Compl. ¶ 26.

With the promotion, Allied changed Tibble's compensation so his wages no longer included commission. Compl. ¶ 23. Instead, Tibble received a $33,575 increase in his base salary. *Id.* Allied also increased his bonus potential by 25%. *Id.* But in order to receive the promotion and raise, on July 28, 2014 — the date of his promotion — Tibble signed an updated Non-Competition, Non-Solicitation and Confidentiality Agreement (the "Agreement"). Compl. ¶ 30. Pursuant to the Agreement, Tibble agreed not to render a range of services on behalf of any of Allied's competitors within Tibble's area of responsibility for a period of twelve (12) months after termination of employment with Allied. Ex. A to Compl., ¶ 3.2. Tibble also agreed not to use or disclose Allied's confidential information for five (5) years following the end of his employment. *Id.* at ¶ 2.2.

Tibble voluntarily ended his employment in November 2015, approximately 15 months after he signed the Agreement. Compl. ¶ 34. Shortly thereafter, Tibble began working for Lakeshore Recycling Services ("Lakeshore"). Compl. ¶ 35. Lakeshore is a recycling and waste services provider and is engaged in the same business as Allied. Compl. ¶ 36. Lakeshore and Allied are two

of just six major waste management companies competing in the Chicagoland area. *Id.* Tibble is working as a Sales Manager for Lakeshore out of Lakeshore's Morton Grove office, which is located in the area of responsibility he had when he resigned from Allied. *Id.* Two weeks prior to Tibble resigning from his position with Allied, he emailed Allied's confidential information to his personal email address, including pricing information, container sizes, and service days for one of Allied's customers. Compl. ¶ 33.

## II. **LEGAL STANDARD**

A motion to dismiss for failure to state a claim under Rule 2(b)(6) challenges the legal sufficiency of a complaint. *Hallinan v. Fraternal Order of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). When considering a Rule 12(b)(6) motion to dismiss, a court must accept the plaintiff's allegations as true, and view them in the light most favorable to the plaintiff. *See, Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But where a plaintiff's cause of action arises out of a contract that is attached to the complaint as an exhibit, the Court "may independently examine and form its own opinions about the document." *Forrest v. Universal Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007).

## III. ANALYSIS

Tibble seeks dismissal of Allied's breach of contract claim for two reasons: (1) the contract was not supported by adequate consideration; and (2) the contract is unenforceable as a matter of law. Additionally, Tibble argues that Allied has failed to state a claim for misappropriation of trade secrets. The Court will address each argument in turn.

### A. Count I: Breach of Contract

Postemployment restrictive covenants are carefully scrutinized under Illinois law because they operate as partial restrictions on trade. *Fifield v. Premier Dealer Services, Inc.*, 993 N.E.2d 938, 942 (Ill. App. Ct. 2013). In order for a restrictive covenant to be valid and enforceable, the terms of the covenant must be reasonable in geographic and temporal scope and necessary to protect an employer's legitimate business interest. *Prairie Rheumatology Assocs. v. Francis*, 24 N.E.3d 58, 62 (Ill. App. Ct. 2014). The reasonableness of a restrictive covenant is determined in light of the unique factors and circumstances of the case. *Millard Maintenance Serv. Co. v. Bernero*, 566 N.E.2d 379, 384 (Ill. App. Ct. 1990).

But before even considering whether a restrictive covenant is reasonable, the Court must make two determinations: (1) whether the restrictive covenant is ancillary to a valid contract; and (2) whether the restrictive covenant is supported

by adequate consideration. *Fifield,* 993 N.E.2d at 942. Illinois courts consider the adequacy of consideration in this context in recognition of the reality that "a promise of continued employment may be an illusory benefit where the employment is at-will." *Id.* Absent adequate consideration, a restrictive covenant — though otherwise reasonable — is not enforceable. *Id.*

The parties do not dispute that the Agreement was ancillary to Tibble's employment. Instead, Tibble argues that the Agreement is unenforceable because it was not supported by adequate consideration. Specifically, he argues that the Agreement was only supported by the promise of at-will employment, and his employment with Allied for 15 months after the Agreement was executed was not lengthy enough to serve as adequate consideration. Allied counters that 15 months of employment is sufficient to serve as adequate consideration. Further, it argues that the Agreement was supported by additional consideration beyond Tibble's at-will employment, including his promotion and raise, and his access to Allied's confidential information.

### 1. Adequacy of Consideration

Illinois courts have held that "continued employment for a substantial period" following execution of a restrictive covenant may provide sufficient consideration to support the

covenant. *See, Brown and Brown, Inc. v. Mudron,* 887 N.E.2d 437, 440 (Ill. App. Ct. 2008). "Illinois courts have generally held that two years or more of continued employment constitutes adequate consideration." *Id.* Recent Illinois appellate court opinions have gone a step further and suggested a bright-line rule under which at-will employment is adequate consideration *only if* an employee has worked with the employer for at least two years. *See, e.g., Fifield,* 993 N.E.2d at 943; *Prairie Rheumatology Assoc.,* 24 N.E.3d at 62.

Tibble relies on the *Erie* doctrine to argue that this Court *must* follow the Illinois appellate courts' bright-line approach and conclude that his continued at-will employment did not constitute adequate consideration because it did not last for two years. Specifically, he contends that, under *Erie,* the role of a federal court sitting in diversity is to apply state substantive law, and that where the only exposition of state law in the intermediate or lower courts is not in conflict, a federal court is not at liberty to reject those decisions merely because it does not agree with their reasoning. *See, Fidelity Union Trust Co. v. Field,* 311 U.S. 169, 179 (1940). As the United States Supreme Court has held a state appellate court holding "is a datum for ascertaining state law," and is "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would

decide otherwise." *West v. Am. Tel. & Tel. Co.,* 311 U.S. 223, 237 (1940).

Tibble's assessment of this Court's role is accurate, but incomplete. Because the Illinois Supreme Court has not spoken on this issue, this Court is also faced with the task of making "a predictive judgment as to how the Supreme Court . . . would decide the matter if it were presented presently to the tribunal." *Allstate Ins. Co. v. Menards, Inc.,* 285 F.3d 630, 635 (7th Cir. 2002) ("[T]he duty of the federal court, sitting in diversity, is to determine the content of state law as the highest court of the state would interpret it." (citing *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938))).

Of the five federal courts in the Northern District of Illinois to have considered this issue, four have predicted that the Illinois Supreme Court will reject the Illinois appellate courts' bright-line approach in favor of a more fact-specific approach. *Compare, R.J. O'brien & Assoc., LLC v. Williamson,* 2016 WL 930628, at *3-4 (N.D. Ill. Mar. 10, 2016); *Traffic Tech, Inc. v. Kreiter,* 2015 WL 9259544, at *5 (N.D. Ill. Dec. 18, 2015); *Bankers Life & Cas. Co. v. Miller,* 2015 WL 515965, at *3-4 (N.D. Ill. Feb. 6, 2015); *Montel Aetnastak, Inc. v. Missen,* 998 F.Supp.2d 694, 716 (N.D. Ill. 2014); *with Instant Technology, LLC v. DeFazio,* 40 F.Supp.3d 989, 1010 (N.D. Ill. 2014). Judge Joe Billy McDade, in the Central District of

Illinois, reached the same conclusion after an extensive analysis of the case law. *Cumulus Radio Corp. v. Olson,* 80 F.Supp.3d 900, 905-09 (C.D. Ill. 2015).

This Court is likewise not convinced that the Illinois Supreme Court would adopt the state appellate courts' bright-line approach. It is true that generally, Illinois courts have held that continued employment for two years or more constitutes adequate consideration. But saying that courts have generally found this "to be sufficient is very different than saying that anything *less* than two years is *automatically insufficient*." *McInnis v. OAG Motorcycle Ventures, Inc.,* 35 N.E.3d 1076, 1089 (Ill. App. Ct. 2015) (Ellis, J., dissenting). The point of requiring adequate consideration for a restrictive covenant is to prevent an employer from locking an at-will employee into a restrictive covenant and then firing that employee shortly thereafter, rendering the consideration of future employment "illusory." *See, Brown & Brown,* 887 N.E.2d 437, 440 (Ill. App. Ct. 2008); *Curtis 1000, Inc. v. Suess,* 24 F.3d 941, 946 (7th Cir. 1994). But this goal may be accomplished through 15 months or two years of continued employment depending upon the other circumstances surrounding the employee's signing of the covenant, the conditions of the continued employment, and the termination of the employment relationship. In short, "there is nothing particularly significant about the term of 24 months

that should elevate it to a *per se* minimum requirement." *McInnis,* 35 N.E.3d at 1089 (Ellis, J., dissenting).

Although in recent years Illinois appellate courts have embraced the two-year bright-line rule, prior to the pronouncement of the rule in *Fifield,* the courts took a more fact-specific approach. For example, in *McRand, Inc. v. van Beelen,* the court did not constrain itself by applying a bright-line test, but rather considered the employees' raises and bonuses, voluntary resignation, and the increased responsibilities they received after signing a restrictive covenant. *McRand, Inc. v. van Beelen,* 486 N.E.2d 1306, 1314 (Ill. App. Ct. 1985). Another court went so far as to state that case law did not "limit[] the courts' review to a numerical formula for determining what constitutes substantial continued employment." *Woodfield Grp., Inc. v. DeLisle,* 693 N.E.2d 464, 469 (Ill. App. Ct. 1998). Other factors, "such as whether the employee or the employer terminated employment, may need to be considered to properly review the issue of consideration." *Id.*

The Court reads little into the fact that the Illinois Supreme Court has twice refused to grant petitions for leave to appeal on this issue. *See, McInnis,* 35 N.E.3d at 1076, *leave to appeal denied,* 39 N.E.3d 1003 (Ill. 2015); *Fifield,* 993 N.E.2d at 938, *leave to appeal denied,* 996 N.E.2d 12 (Ill. 2013). *McInnis* involved an interlocutory appeal from a denial of a

motion for injunctive relief. *McInnis,* 35 N.E.3d at 1081. And the two-year bright-line rule was not necessary to the outcome of *Fifield,* because the approximately three months of post-covenant employment fell far short of any possible articulation of a "substantial period of time" required by the case law. *Fifield,* 993 N.E.2d at 940.

Moreover, where the Illinois Supreme Court has spoken on restrictive covenants — addressing whether the terms of a covenant are reasonable — the court affirmatively rejected a rigid, bright-line test in favor of a case-by-case analysis. *See, Reliable Fire Equipment Co. v. Arredondo,* 965 N.E.2d 393 (Ill. 2011). In *Reliable Fire,* the court overruled appellate decisions that had taken a more rigid approach, and reemphasized its commitment to a test "grounded in the totality of the circumstances." *Id.* It is probable, that if confronted with the question of the adequacy of consideration, the court would likewise avoid the appellate courts' bright-line test in favor of a more flexible case-by-case determination, considering the totality of the circumstances.

Applying this more flexible test, the Court finds the Complaint alleges sufficiently that there was adequate consideration to support the enforceability of the Agreement. Specifically, the circumstances surrounding the signing of the Agreement (Tibble's promotion and increase in pay) and his

apparently voluntary resignation are relevant to the analysis and weigh in favor of requiring a shorter length of post-covenant employment. But whether 15 months is adequate turns on disputed and yet-to-be explored facts, and is therefore not appropriate for determination at this stage in the proceedings. The Court denies Tibble's Motion to Dismiss for lack of adequate consideration.

### 2. *Reasonableness in Scope*

Tibble next argues that the Agreement is unenforceable because it is overly broad with respect to its prohibition against competition and its prohibition on disclosure and use of confidential information. A restrictive covenant is only valid if it is reasonable, and is reasonable only if the covenant: (1) is no greater than is required for the protection of a legitimate business interest of the employer; (2) does not impose undue hardship on the employee, and (3) is not injurious to the public. *Reliable Fire,* 965 N.E.2d at 396. The extent of the employer's legitimate business interest may be limited by type of activity, geographical area, and time. *Id.* at 396-97.

The reasonableness of a restrictive covenant is determined "based on the totality of the facts and circumstances of the individual case." *Id.* at 403. Thus, unless the covenant is patently unreasonable, the parties must be given a full opportunity to develop the necessary evidentiary record. *See,*

e.g., *Traffic Tech*, 2015 WL 9259544, at *5; *Hafferkamp v. Llorca*, 2012 WL 6965102, at *5 (Ill. App. Ct. Feb. 3, 2012); *see also, Nortek Products (Taicang) Ltd. v. FNA Grp., Inc.*, 2011 WL 2110043, at *4 (N.D. Ill. May 24, 2011) ("[W]hether such restrictions are reasonable in this case requires the Court to make a fact-based determination that is not appropriate at the motion-to-dismiss stage."). The Court will discuss the validity of each aspect of the Agreement in turn.

### a. Prohibition against Competition

The Agreement prohibits Tibble, for 12 months after his employment ends, from competing with Allied within his area of responsibility and from rendering services on behalf of any competitor. Tibble's area of responsibility includes "any geographic regions, areas, markets, districts, territories, counties, parishes or other locations" for which he was responsible, or performed duties, on behalf of Allied during the last 12 months of his employment. Ex. A to Compl., ¶ 3.1(f). The Agreement prohibits Tibble from, among other things, "performing any kind of services, functions, duties or actions (including, but not limited to, sales, marketing, brokering, supervision and/or management) related to Non-hazardous Solid Waste Management." *Id.* at ¶ 3.1. Allied's competitors, as defined by the Agreement, include "any public or private business that provides Non-hazardous Solid Waste Management in

any state, territory or other location in which [Allied] conducts business." *Id.* at ¶ 3.1(b). Moreover, Tibble's duties and obligations under the Agreement were owed not only to Allied, but also to its parent, subsidiary, related or successor companies. *Id.* at ¶ 7.

Tibble argues that this prohibition is invalid because it is unreasonably overbroad. Specifically, Tibble contends that under the Agreement he is effectively barred from having any association whatsoever with a competitor of Allied or its affiliates. Although the Court is sympathetic to Tibble's argument regarding the breadth of the definition for "rendering services," the prohibition is limited both in duration and geographic range, which weighs in favor of its enforceability. In this light, the restriction is not unreasonable on its face; it would be inappropriate to determine its reasonableness without considering all of the surrounding facts and circumstances.

Among many other potentially relevant facts, the reasonableness of the restriction will depend on a determination of Tibble's area of responsibility and his duties during his employment with Allied. Moreover, the Court has little information thus far regarding the number and size of companies that fall within the definition of "competitor" under the Agreement or the size of the waste management industry as a

whole. Allied contends that the Agreement prohibits Tibble from working for 5-7 companies. Whether this is an unreasonable restriction depends largely on the size of the industry and the number of companies that fall within the geographic limitations of the Agreement. Because the facts of the case are of such importance to this issue, the Court does not find the prohibition against competition to be patently unreasonable and declines to make a determination as to the enforceability of the provision at this stage in the proceedings.

### b. Prohibition on Disclosure and Use of Confidential Information

The Agreement also prohibits Tibble from using or disclosing confidential information for five years following the end of his employment. Ex. A to Compl., ¶ 2.2. It defines confidential information as the proprietary information of Allied and its affiliates, including, but not limited to:

> [I]nformation that would qualify as a trade secret; customer lists and agreements; customer service information; names of customer contacts and the identities of decision-makers; marketing plans; development plans; formulas; price data; cost data; price and fee amounts; pricing and billing policies; quoting procedures; marketing techniques; forecasts and forecast assumptions and volumes; non-public information regarding Company's actual or potential customers, suppliers or other vendors; non-public information about Company's routes, territories or target markets; Company's internal personnel and financial information, including purchasing and internal cost information and information about the profitability of particular operations; internal sales, service and operational manuals, policies and

> procedures; non-public information regarding the manner and methods of conducting Company's business; non-public information about Company's future plans, potential acquisition, divestiture and other strategies; non-public information about Company's landfill development plans, landfill capacities, special projects and the status of any permitting process or investigation; non-public information that gives Company some competitive business advantage, or the opportunity of obtaining such an advantage, or the disclosure of which could be detrimental to Company's interests; and other information that is not generally known outside Company.

*Id.* at ¶ 2.1.

Tibble argues that this prohibition is overbroad because it prohibits the use or disclosure of *any information* obtained by him during the course of his employment with Allied concerning the business or affairs of Allied and its Affiliates. Allied counters that the definition of Confidential Information set forth in the Agreement is reasonably limited to specific items that provide Allied with a competitive edge and that are not generally known outside the company. Compl. ¶ 31.

Contrary to Tibble's assertion, the definition of Confidential Information set forth in the Agreement, though broad, does not include "virtually every [item of information] that [Tibble] became aware of during the time he was employed by [Allied]." Rather, the definition is explicitly limited to "non-public information" and "information that would qualify as a trade secret." Ex. A to Compl., ¶ 2.1. It may prove true that some of this non-public information does not merit

protection under a confidentiality provision, but that determination is a factual one which can only be made after the parties have engaged in discovery.

Tibble also argues that the confidentiality provision is unenforceable because it extends for five years after Tibble's employment ends and covers "any person or entity either inside or outside" of Allied and its affiliates "within the United States or any other territory or location in which" Allied and its affiliates do business. The Court agrees that the provision lacks any reasonable durational and geographic limitations. But this does not render the provision automatically unenforceable. While it is true that a valid confidentiality provision must contain durational and geographic limitations, *Cincinnati Tool Steel Co. v. Breed*, 482 N.E.2d 170, 175 (Ill. App. Ct. 1985), this requirement does not extend to trade secrets. *Packaging v. Hein*, 2015 WL 6164957, at *6 (N.D. Ill. Oct. 20, 2015). Thus, in order for the Court to determine the enforceability of the confidentiality provision, it will need to determine whether the information covered by the provision constitutes trade secrets. This will require discovery.

### B. Count II: Misappropriation of Trade Secrets

To establish a claim for misappropriation of trade secrets under the Illinois Trade Secrets Act ("ITSA"), a plaintiff must show that (1) a trade secret existed; (2) it was misappropriated

through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner. *Liebert Corp. v. Mazur,* 827 N.E.2d 909, 925 (Ill. App. Ct. 2005); 765 ILCS 1065/2. A trade secret is:

> [I]nformation, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILCS 1065/2(d). Trade secrets include "customer lists that are not readily ascertainable, pricing, distribution, and marketing plans, and sales data and market analysis information." *Minttel Intern. Grp., Ltd. v. Neergheen,* 2010 WL 145786, at *11 (N.D. Ill. Jan. 12, 2010).

Allied bases its ITSA claim on a theory of inevitable disclosure. Specifically, it alleges that Tibble knew Allied's financial and operational strategy for 2016 in an industry with only a handful of competitors, that he emailed Allied's confidential information to his personal email address shortly before his employment ended, that he now works for Lakeshore — one of Allied's main competitors, and that his job responsibilities at Lakeshore make disclosure of this confidential information inevitable. Compl. ¶¶ 26, 33, 56.

In seeking to dismiss this claim, Tibble argues that Allied must "plead something more than its mere *fear*" of disclosure of confidential information. But under a theory of inevitable disclosure, a plaintiff need not point to concrete evidence of misappropriation. He must merely allege that the employee "cannot operate without inevitably disclosing the confidential information." *Complete Bus. Sols., Inc. v. Mauro*, 2001 WL 290196, at *6 (N.D. Ill. Mar. 16, 2001) (emphasis added). Allied has done at least this much. Therefore, the Court declines to dismiss Allied's ITSA claim.

## IV. <u>CONCLUSION</u>

For the reasons stated herein, Tibble's Motion to Dismiss [ECF No. 16] is denied.

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　
　　　　　　　　　　　　　　　　　　Harry D. Leinenweber, Judge
　　　　　　　　　　　　　　　　　　United States District Court

Dated: April 7, 2016